# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

GENERAL INSURANCE COMPANY OF
AMERICA,

        Plaintiff,

v.                                                                    No. CIV 99-1009 BB/LFG

STEPHEN J. RHOADES,

        Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court for consideration of Defendant's ("Rhoades") motion to amend his answer and modify an admission he made in the initial pretrial report (Doc. 20); a motion to intervene filed by John C. Craft (Doc. 26); and Plaintiff's motion for summary judgment (Doc. 31). The Court has reviewed the submissions of the parties and the relevant law. For the reasons set forth below, the Court will grant the motion to amend, deny the motion to intervene without prejudice to renewal of the motion, and deny the motion for summary judgment.

**FACTS**

Rhoades is an attorney licensed and practicing in New Mexico. Plaintiff is an insurance company and provided professional liability coverage to Rhoades from September 1995 to September 1999. The coverage was provided in successive policies issued for an annual term. These policies were claims-made policies, rather than occurrence policies; this meant they provided coverage for claims made against Rhoades during the policy terms, even if the claimed acts of professional malpractice did not occur during the policy term. In the early 1990's, Rhoades represented Meadowlark Insurance Company ("Meadowlark"). During that time several of Meadowlark's

directors looted the company, leaving Meadowlark insolvent. Craft, the would-be intervenor in this case, was appointed as liquidator of Meadowlark. Craft's position required him to locate any assets that might belong to Meadowlark, collect those assets, and distribute them to policyholders and others injured as a result of Meadowlark's insolvency.

In 1996, Craft contacted Rhoades, through a phone call to Rhoades' attorney, and asked for assistance from Rhoades in locating Meadowlark's assets. As discussed in this opinion, Craft may or may not have also stated he would be willing to give Rhoades a release in exchange for the limits of Rhoades' malpractice policy. In the materials provided to this Court to date concerning that conversation, there are no facts or allegations indicating the nature of any possible negligence or wrongdoing by Rhoades, or explaining why Craft felt he was entitled to the limits of the policy. Approximately three years later, in the spring of 1999, Craft provided Rhoades a copy of a draft complaint for professional malpractice and breach of contract, which Craft intended to file against Rhoades. Rhoades sent a copy of the draft complaint to Plaintiff, to apprise Plaintiff of the potential claim. Subsequently, Craft did file the complaint, in a Missouri state court.

Plaintiff undertook defense of the Missouri malpractice action under a reservation of rights. Plaintiff also instituted the instant action, requesting a determination that it has no duty to defend against Craft's claims or to cover Rhoades' potential liability for the claims. Plaintiff maintains coverage under the 1995-96 policy, which was in effect at the time of Craft's initial conversation with Rhoades' attorney, is excluded because Rhoades did not notify Plaintiff of that conversation during the 1995-96 policy period. Plaintiff also maintains coverage under the 1998-99 policy, which was in effect at the time Craft first provided Rhoades a copy of the draft complaint for malpractice, is excluded because Rhoades knew of Craft's potential claim in 1996, prior to the 1998-99 policy period. In other words, Plaintiff maintains Rhoades' procedural default has cost him coverage for

alleged malpractice that clearly occurred, if at all, during a time Plaintiff was collecting premiums from Rhoades for malpractice coverage, gave rise to a claim by Craft during such a time, and was reported to Plaintiff while Plaintiff continued to collect premiums for such coverage. It thus becomes Plaintiff's burden to convince the Court that the terms of Rhoades' policies should contradict the notion that Plaintiff's policies cover Rhoades' liability, since all significant events related to Craft's claims against Rhoades occurred while Rhoades remained insured by Plaintiff.

After Plaintiff initiated this lawsuit and moved for summary judgment, Craft moved to intervene in the lawsuit, claiming to be a party whose interests may be severely affected if Rhoades is left without insurance coverage with respect to the claims brought by Craft. Rhoades, meanwhile, had filed a motion to amend a portion of his answer and a portion of the initial pretrial report. As discussed below, in both the answer and the pretrial report Rhoades had made an admission that forms the primary basis for Plaintiff's motion for summary judgment. Rhoades now wishes to amend that admission. The Court will first address these two motions, before deciding the summary-judgment issue.

**CRAFT'S MOTION TO INTERVENE**

To intervene in this case as a matter of right, Craft must show his motion to intervene was timely; he has a direct, substantial, and legally protectable interest in the litigation; his interest may as a practical matter be impaired during or as a result of the litigation; and his interest is not adequately represented by the parties. *See Coalition of Arizona/New Mexico Counties for Stable Economic Growth v. Dep't of the Interior*, 100 F.3d 837, 841 (10th Cir. 1996).

Plaintiff's primary contention in opposition to Craft's motion is that Craft does not have a direct interest in the case, because Craft has not yet obtained a judgment against Rhoades. A number of federal district courts, and at least one circuit court, have addressed the question facing the Court

in this case: whether a party who has a potential claim against an insured, but who has not yet obtained a judgment against the insured, should be allowed to intervene in a lawsuit brought to resolve a coverage dispute between the insured and the insurer. Some of these courts have refused to allow intervention, finding that a contingent interest in a lawsuit, which is dependent on the would-be intervenor's success in a separate lawsuit, is not sufficient to satisfy the "direct, substantial, and legally protectable interest" requirement. *See, e.g., Redland Ins. Co. v. Chillingsworth Venture, Ltd.*, 171 F.R.D. 206, 208 (N.D. Ohio 1997) ("Movants have nothing more than a hypothetical interest in the present action as they are yet to obtain a judgment in the tort action."); *Independent Petrochemical Corp. v. Aetna Casualty & Sur. Co.*, 105 F.R.D.106, 110 (D.D.C. 1985) ("Until the tort claimants have obtained a judgment against these plaintiffs, their interest in the subject matter of this litigation is purely hypothetical."); *Liberty Mut. Ins. Co. v. Pacific Indem. Co.*, 76 F.R.D. 656, 659-60 (W.D. Penn. 1977).

Other courts have held to the contrary, determining that the contingent nature of a would-be intervenor's interest does not automatically prevent a court from allowing intervention. *See, e.g., Teague v. Bakker*, 931 F.2d 259, 261 (4th Cir. 1991) (agreeing with reasoning that would allow intervention in a dispute between an insurer and its insured even when the intervenor's interest is contingent on the outcome of other litigation)[1]; *St. Paul Fire & Marine Ins. Co. v. Summit-Warren Industries Co.*, 143 F.R.D. 129, 133-34 (N.D. Ohio 1992) (contingent nature of movant's interest is important factor to be considered, but is not determinative); *New Hampshire Ins. Co.v. Greaves*, 110 F.R.D. 549, 552 (D. R.I. 1986) (same); *The Hartford Accident and Indem. Co. v. Crider*, 58 F.R.D. 15, 18 (N.D. Ill. 1973).

---

[1] Although the *Teague* opinion did not say so, its decision may have been influenced by the fact that, by the time the appeal was decided, the intervenors had in fact obtained a judgment against the insured, in their independent lawsuit.

The Court agrees with the reasoning of cases such as *Teague* and *Greaves*, holding that the contingent nature of an interest is only one a factor to be considered in analyzing the intervention issue, rather than determinative of the question. In the Tenth Circuit, the "interest" test is quite liberal, and is intended to dispose of lawsuits by involving as many apparently concerned persons as possible, consistent with efficiency and due process. *See Coalition*, 100 F.3d at 841. Imposing a flat ban on intervention, simply because a party's interest has not yet ripened, runs contrary to this inclusive approach. It also creates a risk that a mere matter of timing could jeopardize the strong interest of a third party in the outcome of a contest between insurer and insured. For example, in this case, if Craft had already obtained a judgment against Rhoades, Craft would have a clear interest in maximizing Rhoades' insurance coverage, unless Rhoades could satisfy the judgment out of his own assets. The fact that Craft has not obtained such a judgment should not, standing alone, deny him the opportunity to intervene in this case. *See Teague; Greaves*. The Court will therefore analyze the other intervention factors discussed in *Coalition*.

Craft must establish that his interest may as a practical matter be impaired if he is not allowed to intervene. This factor has been given great weight in cases allowing a third-party tort claimant to intervene in a coverage dispute between insurer and insured. Where the claimant's only real hope of recovery rests in establishing the existence of insurance coverage, courts have a strong tendency to grant the claimant's motion to intervene. *See, e.g., Teague*, 931 F.2d at 261 (existence and amount of insured's assets, which might be available to satisfy intervenors' judgments, were questionable); *St. Paul*, 143 F.R.D. at 134 (if insurer were victorious in coverage case, intervenor's recourse would be against a defunct corporation and related persons, with questionable assets); *Greaves*, 110 F.R.D. at 553 (if insurer prevails in instant action, intervenor's sole recourse would be against insured, who was without sufficient assets to satisfy a substantial judgment). In the case before the Court, it is

difficult to assess this factor because no information has been provided concerning Rhoades' financial condition. It is certainly possible Rhoades would be unable to pay a large judgment out of his personal assets. Even if Rhoades has substantial personal assets, however, as a practical matter, if Craft obtains a large judgment against Rhoades, it "may" be much more difficult to satisfy such a judgment against an individual, who could take refuge in bankruptcy, than against a large insurance company. Therefore, the Court will find this factor has been satisfied, although it does not weigh strongly in favor of intervention.

As noted above, Craft must also show that the representation of his interests by the existing parties may be inadequate. *Coalition*, 100 F.3d at 844. This burden is minimal. *Id.* However, where the objectives of the would-be intervenor are identical to those of one of the parties, the representation is presumptively adequate. *Id.* In this case, Craft's objective is the same as Rhoades'– Craft wants to establish that Plaintiff's malpractice coverage covers his claim against Rhoades, and Rhoades has exactly the same objective. Craft admits that he has no qualms about the performance or abilities of Rhoades' current counsel, and Craft has made no showing that Rhoades is limited financially in defending against Plaintiff's attempt to disavow coverage. The only point raised by Craft with respect to the inadequate-representation question is that Rhoades has admitted to certain facts that are not true, and which may harm Rhoades' defense in this case, thereby harming Craft's interests. As discussed below, however, the Court will grant Rhoades' motion to amend the admissions, and summary judgment will not be awarded on the basis of those admissions. Therefore, Rhoades is in the same position as Craft with respect to the admissions, and it is not necessary for Craft to intervene to contest them. At this point, therefore, the goals, objectives, and litigation positions of Craft and Rhoades are identical. Since that is the case, and since Craft offers no other

6

argument to rebut the presumption of adequate representation, the Court will deny the motion to intervene as of right on the grounds that Rhoades is adequately representing Craft's interests.[2]

The Court will also deny, at least at this time, Craft's request for permissive intervention. The decision to allow such intervention is discretionary with this Court. *See Kiamichi R.R. Co., Inc. v. Nat'l Mediation Bd.*, 986 F.2d 1341, 1345 (10th Cir. 1993). As discussed above, Craft's interests are adequately represented in this case by Rhoades, and there appears to be no reason to add a party whose pleadings and litigation position will merely duplicate Rhoades' filings and arguments. Should an issue of adequate representation or divergence of interests arise in the future, the Court remains open to reconsideration of the intervention question.[3]

### RHOADES' MOTION TO AMEND ANSWER AND PRETRIAL REPORT

In his answer to the complaint, Rhoades admitted that in the spring of 1996, Rhoades' attorney ("German") "inquired of him regarding the location of Meadowlark assets and advised him that Craft had offered a complete release in exchange for payment of his malpractice limits." This admission was carried forward into the initial pre-trial report. Rhoades now wishes to change the admission and modify the pre-trial report, to admit the following: Craft spoke with German to ask whether Rhoades would be available to assist in locating Meadowlark assets; German did not tell Rhoades that Craft had offered a complete release in exchange for his malpractice limits; German did

---

[2]Due to this disposition of the motion, the Court need not address Plaintiff's argument that Craft's motion to intervene was not timely. The Court notes, however, that the motion was filed only a few months after the lawsuit was initiated, and before any significant discovery had been performed. If faced with the issue, therefore, the Court would find Craft's attempt to intervene was timely.

[3]It is not clear to the Court why Plaintiff wishes to exclude Craft from the case, at the risk of having to re-litigate the coverage issue in the future. If Craft were a party to this case, he would clearly be bound by the result of the case, due to the doctrine of claim preclusion. Since Plaintiff has vigorously contested Craft's attempt to intervene, however, the Court will not at this time add to the possible complexity of this case.

tell Rhoades that if he assisted Craft, he should demand a release from Craft before providing such assistance. Plaintiff strongly objects to the proposed amendment, maintaining that it is a desperate attempt to avoid summary judgment (as discussed below, Plaintiff's motion for summary judgment is entirely based on Rhoades' admission). Plaintiff contends Rhoades is acting in bad faith in attempting to change his account of his conversation with German.

The following evidence has been offered with respect to the motion to amend. Rhoades filed two affidavits indicating his initial admissions were based on his recollection of conversations that had occurred over three years before, and he had now had the opportunity to review notes of those conversation. Rhoades has also submitted copies of German's notes, including notes of German's conversation with Craft as well as German's conversation with Rhoades. Plaintiff has filed an affidavit of an investigator who interviewed both German and Rhoades before the admissions were made. Finally, Craft has weighed in with an affidavit of his own, maintaining he made no offer in his conversation with German and had no grounds to think he had a claim against Rhoades until much later, after he had investigated the Meadowlark situation more thoroughly.

Of the foregoing evidence, the Court finds most persuasive the contemporaneous notes of the two conversations, recorded by German. These notes support, to some extent, both versions of the 1996 events. The notes of the conversation with Craft clearly detail Craft's desire to "use Steve to help recover assets," and reveal that Craft encouraged Rhoades to "work with the regulators rather than fight them." The notes contain no mention of an offer to settle for the limits of Rhoades' malpractice coverage. They do, however, state that Craft "may want to make a claim on malpractice policy," indicating the subject of a possible malpractice claim may have been raised. As to German's conversation with Rhoades, there is also no mention of an offer to settle, or any reference to malpractice insurance. There is, however, an indication that Rhoades might be amenable to "an

8

employment agreement w/ release," indicating the subject of a release was raised by someone. The notes additionally indicate Rhoades felt a release was mandatory up front, because he did not have as much information about Meadowlark as Craft thought he did.

It is plain that the most reliable evidence of the conversation between German and Rhoades does not entirely support either party's version of what actually happened in that conversation. Given the factual conflict concerning the conversation, it appears the proper route to take is to present the facts to a jury and allow the jury to determine what the true facts are. It is possible, as Plaintiff argues, that the initial admissions made by Rhoades reflect those true facts, and that the altered version he now proffers is merely an attempt to avoid summary judgment. It is also possible, however, that Rhoades was prompted into investigating the conversations further when he discovered Plaintiff planned to file a motion for summary judgment based exclusively on his admissions, and truly did refresh his recollection with the notes of the conversations.

Plaintiff claims it will be prejudiced by allowing the withdrawal of Rhoades' admissions. The fact that Plaintiff filed for summary judgment based on the admissions, and will now have to convince a trier of fact, is not sufficient prejudice to deny the motion. *See F.D.I.C. v. Prusia*, 18 F.3d 637, 640 (8th Cir. 1994); *Brook Village North Assocs. v. Gen. Elec. Co.*, 686 F.2d 66, 70 (1st Cir. 1982). Plaintiff will, however, be forced to reopen discovery and expend additional resources in an attempt to determine what transpired between German and Rhoades. This could clearly have been avoided and discovery handled more expeditiously and efficiently if Rhoades had been more conscientious and diligent regarding his discovery obligations. In order to ameliorate the prejudice caused Plaintiff, the Court will permit Rhoades to withdraw his prior admissions conditioned upon the payment of Plaintiff's reasonable discovery expenses necessitated by the reopening of discovery into the subject of the admissions. *Cf. Hadley v. United States,* 45 F.3d 1345, 1350 (9th Cir. 1995) (denial of motion

9

to withdraw deemed admissions was abuse of discretion; district court should have considered lesser sanctions, such as payment of government's increased costs and expenses); *In re: Two Appeals, San Juan Dupont Plaza Hotel Fire*, 994 F.2d 956, 965 (1st Cir. 1993) (discussing district court's authority, under former version of Rule 26(f), to allocate costs of discovery).  Also, Plaintiff will be allowed to present the admissions made by Rhoades to the jury, as evidence of the matters admitted. *See, e.g.*, *Gerlach v. Volvo Cars of North America*, 1997 WL 129004, fn. 2 (E.D. Pa.) (when leave to amend is granted, the original pleading may be entered into evidence and used to establish an admission by a party-opponent).

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff has moved for summary judgment on the coverage issue, maintaining Craft's claim against Rhoades is not covered by either the 1995-96 policy or by the 1998-99 policy. Each of these policies covers claims against Rhoades, "first made" against him during the policy period, and reported to Plaintiff within that policy period or within thirty days after the expiration of the period. Each of these policies also has an exclusion clause. This clause states no coverage will be provided for claims arising out of any actual or alleged error, omission, or circumstance likely to give rise to a claim, if Rhoades knew or had reason to anticipate, prior to the inception date of the policy, that the error, omission or circumstance might result in a claim. In other words, according to Plaintiff, if Rhoades knew about an actual or alleged error, omission, or circumstance before he purchased his policy, and knew or had reason to anticipate the error, omission, or circumstance would result in a claim, coverage would be denied for that claim when it was finally made. As noted above, Plaintiff claims there is no coverage under the 1995-96 policy because Rhoades reported no claim to Plaintiff during that policy period. In addition, Plaintiff claims there is no coverage under the 1998-99 policy because Craft's claim, although first reported to Plaintiff during this policy period, arose out of a

circumstance Rhoades knew about before the inception date of the 1998-99 policy, and this circumstance was such that Rhoades knew or had reason to anticipate a claim would result. In plain, non-insurance-policy language, Plaintiff maintains Rhoades knew it was likely Craft was going to make a claim against him, and knew that fact before the 1998-99 policy period began, and Craft's claim is therefore excluded from coverage.

Summary judgment will be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995) . Plaintiff's motion is based primarily on the admissions made by Rhoades in his answer and in the pretrial report. Plaintiff argues that, as these admissions show, Rhoades knew Craft had inquired about the location of Meadowlark assets, and knew Craft had offered a complete release in exchange for payment of Rhoades' malpractice policy limits. Plaintiff also points to the undisputed facts that Rhoades was legal counsel for Meadowlark, that Meadowlark was fraudulently operated and looted by several con-artists, and that at least two of these con-artists were convicted of multiple federal felonies. These facts, according to Plaintiff, should have alerted a reasonable attorney to the fact that a claim might be made against him.

As discussed above, Rhoades's admissions are no longer uncontradicted and binding, and thus the most significant basis for Plaintiff's summary judgment has been removed. However, summary judgment would not have been appropriate even if the admissions were not amended.

In his brief, Rhoades argued there is no evidence he was aware of any specific act, errors, or omissions that might have given rise to a claim. Such knowledge, he maintained, is a prerequisite to application of the prior-knowledge provision of the policies. Plaintiff, on the other hand, contends

11

the only knowledge required was knowledge that Craft might make a claim against Rhoades, even if Craft did not indicate the factual basis of such a possible claim. Plaintiff argues it was enough that Rhoades knew he had represented Meadowlark, knew Meadowlark had been looted, knew Craft was the liquidator of Meadowlark, knew Craft had inquired about his knowledge of any Meadowlark assets, and knew Craft had offered a complete release in exchange for Rhoades' malpractice limits. Thus, Plaintiff states it is "not important" whether or not Craft articulated the factual basis for his offer of a release.

The general rule is that a "lawyer is not required to give notice under a malpractice policy until he has reason to believe he has injured a ... client by his negligence." 8 John L. Appleman and Jean Appleman, *Insurance Law and Practice* § 4742, pp. 146-47 (1981). After citing cases in support of this rule, the authors conclude:

> This is the only reasonable result. Otherwise, such insurers would be deluged with correspondence from their insureds. So far as trial lawyers are concerned, in every trial one attorney must lose, and the loser might well be second guessed as to his strategy or skill; counsel handling a contested divorce suit often has a client not completely satisfied with the result; and the office lawyer encounters dozens of situations which could lead to some problems later developing.

*Ibid.* at p. 148. Based on this general rule the courts have applied a reasonable-attorney standard to the type of prior-knowledge provision applicable in this case. This test is more in accord with Rhoades' position than Plaintiff's. For example, in *Selko v. Home Ins. Co.*, 139 F.3d 146, 152 (3d Cir. 1998), the court held that the words "basis to believe that the Insured had breached a professional duty" implicated a two-step analysis: first, the insured must have known certain facts; second, a reasonable lawyer in possession of those facts would have had a basis to believe the insured had breached a professional duty. Similarly, in *Ehrgood v. Coregis Ins. Co.*, 59 F.Supp.2d 438, 443 (M.D.Pa. 1998), a case relied on heavily by Plaintiff, the court applied the reasonable-attorney test

12

and stated that, under this test, the attorney must have known of an act, error, incident, or omission, and must have known or could have expected it would result in a malpractice claim. The emphasis in both *Selko* and *Ehrgood*, as well as other cases, is on the insured attorney's knowledge of specific facts forming the basis of claims that were later brought by disappointed clients.

The Court rejects Plaintiff's approach, which would exclude coverage whenever an insured has been threatened with a claim, no matter how idly. An attorney who has no idea he or she has done anything wrong, and knows no facts indicating any performance has been substandard, is generally not expected to anticipate that a disappointed client will actually file a malpractice claim. *Cf. Hoyt v. St. Paul Fire and Marine Ins. Co.*, 607 F.2d 864, 866 (9th Cir. 1979) (letter pointing out that attorney's actions had caused substantial tax liability for estate, and asking for explanation, did not constitute a "claim" under malpractice policy). If the client has alleged no specifics, and the attorney has no knowledge of any deficient performance of his or her duties, the attorney would be justified in assuming the client's threats are mere mutterings not likely to come to fruition.

The facts of this case, as presented so far, illustrate the problem created by Plaintiff's expansive interpretation of the exclusion provision. Craft's conversation with Rhoades' attorney in 1996 was in the context of Craft's attempt to gain Rhoades' assistance and cooperation in locating Meadowlark assets. According to the notes of the conversation between Craft and German, Craft made vague statements about Rhoades' "responsibility" for the activities of Meadowlark's looters, told German that Rhoades could "redeem" himself, and said he "may" want to make a claim on Rhoades' malpractice policy. Unless Rhoades knew of particular allegations of wrongdoing, for example that he knew of the looting of Meadowlark but failed to take steps to prevent it, it may well have been reasonable for him to dismiss Craft's statements as a negotiating ploy designed to pressure him to enlist in the effort to find Meadowlark assets, rather than a legitimate claim for

13

particular acts, errors, or omissions. For these reasons, a factual inquiry is necessary to determine what, exactly, Craft may have said to German about Rhoades' possible wrongdoing; what, exactly, German conveyed to Rhoades on that subject; and what, exactly, Rhoades may have known about any act, error, or omission that could be attributed to him by Craft.

Given the specific policies at issue in this case, there is another reason summary judgment is inappropriate even if the admissions were not amended. One argument Rhoades has raised is that he was continuously insured by Plaintiff during the entire time at issue in this case, and therefore there is not a risk that he will receive coverage he did not pay for. Plaintiff responds simply, by pointing out that each policy purchased by Rhoades was separate and covered only a one-year policy period, so each policy must be analyzed separately for notice purposes. The Court finds ambiguity in the policy language, especially under circumstances of continuous coverage. Under Plaintiff's interpretation of the policy, an insured attorney could do everything right and still be deprived of coverage over a claim. For example: an attorney represents a client, who expresses extreme dissatisfaction with the result of the case but does not specify any particular shortcomings in the attorney's performance. The client does, however, say he is thinking about going to see another lawyer to see what can be done. At this point, no claim has been made, because the client has not demanded money or services[4] and has not specified anything the attorney did wrong. *See, e.g., McCullough v. Fidelity & Deposit Co.*, 2 F.3d 110, 112-13 (5th Cir. 1993) (under claims-made policy, notice of specified wrongful acts was required to trigger coverage); *Hoyt, supra*. The attorney therefore cannot obtain coverage for this incident under Plaintiff's policy, because even if the attorney reports the incident, no claim has been filed within the policy period. However, the incident is clearly

---

[4]The policy defines a "claim" in terms of a demand for money or services, including, but not limited to, service of suit or institution of arbitration proceedings against the insured.

14

one that indicates a malpractice claim might be forthcoming. Three years later, the former client does file a malpractice lawsuit. At this point, even though the attorney has been faithfully paying malpractice insurance premiums every year, coverage of the claim will be denied because the claim arises out of a circumstance which the attorney had a basis to reasonably anticipate the former client would lead to a claim, no matter how baseless the claim might be.[5]

Furthermore, under Plaintiff's policy provisions, the attorney would be unable to protect herself from this situation, because no extended reporting period is available to insured attorneys who renew their policies; this option is only available if a policy is canceled or "non-renewed." *See, e.g., Thoracic Cardiovascular Assocs., Ltd. v. St. Paul Fire and Marine Ins. Co.,* 891 P.2d 916, 922-23 (Ariz. App. 1994) (ability to purchase extended reporting period found significant in assessing validity of notice requirement in claims-made policy). Under New Mexico law, exclusionary provisions in insurance policies are to be narrowly construed, based upon the reasonable expectations of the insured. *See Knowles v. United Servs. Auto. Ass'n*, 832 P.2d 394, 396 (1992). It is plain to the Court that the reasonable expectations of attorneys insured by Plaintiff would not include the possibility they could be deprived of coverage over a claim under the circumstances described above. The Court must therefore construe the exclusionary provision in such a way as to avoid forfeiture of the purchased coverage. *See id.*

---

[5]Many claims-made policies anticipate the described scenario and provide a means for the insured to obtain coverage. An example of such a policy is found in *LaForge v. American Casualty Co. of Reading, Pa.*, 37 F.3d 580, 582 (10th Cir. 1994). This policy required the insured to report claims *or any occurrence which may subsequently give rise to a claim.* The policy then provided coverage for both claims made during the policy period and occurrences reported during that period, if the occurrences later ripened into an actual claim. *See also F.D.I.C. v. St. Paul Fire and Marine Ins. Co.*, 993 F.2d 155, 158 (8th Cir. 1993) (discussing claims-made policies which permit reporting of potential claims, and provide coverage for lawsuits that subsequently arise out of the reported potential claims, even if the lawsuits are brought after the policy period expires).

Under New Mexico law, the Court can not construe the policies in a manner that would allow facts or circumstances occurring in 1996, but not sufficient to trigger coverage under the 1995-96 policy, to then be used to deny coverage under the prior-knowledge exclusion provision in the 1998-99 policy. In this context, then, the Court finds Plaintiff's policy is ambiguous. Plaintiff's request for summary judgment will therefore be denied.[6]

**CONCLUSION**

Based on the foregoing discussion, the motion to intervene will be denied at this time, the motion to amend the answer and modify the initial pre-trial report will be granted, and the motion for summary judgment will be denied.

**ORDER**

A Memorandum Opinion having been entered this date, it is hereby ORDERED as follows: Defendant's motion to amend his answer and modify the initial pre-trial report (Doc. 20) is GRANTED; John Craft's motion to intervene (Doc. 26) is DENIED; and Plaintiff's motion for summary judgment (Doc. 31) is DENIED.

---

[6]Due to this resolution of the motion, the Court need not decide whether the "notice/prejudice rule" applies to claims-made policies. The Court does note, however, that the only cases cited by Rhoades in support of such application are cases decided in jurisdictions that have statutes mandating such application. *See, e.g., Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087 (7th Cir. 1999).

Dated this 7th day of September, 2000.

                                                BRUCE D. BLACK
                                                United States District Judge

**ATTORNEYS**:

**For Plaintiff**:
Daniel W. Lewis
F. Matthew Smith
Hatch, Allen & Shepherd, P.A.
P.O. Box 30488
Albuquerque, New Mexico 87190

**For Defendant**:
Rudolph A. Lucero
Miller, Stratvert & Torgerson, P.A.
P.O. Box 25687
Albuquerque, New Mexico 87125

**For John Craft:**
Robert L. Brace
Hollister & Brace
1126 Santa Barbara St.
Santa Barbara, California 93101